SAMUEL D. HINMAN, Respondent, *v.* WILLIAM H. HARE, Appellant.

*Court of Appeals, January* 18, 1887.

Reversing same case, 33 Hun, 660.

1. *Evidence. General objection.*—Where a question and an answer cover both facts that are competent and material, and those that are incompetent and immaterial, both are improper. A question must be wholly competent and material, or it must be excluded. When a party assumes to prove in bulk a large group of facts, he must be sure that they are all competent; and it is no answer to an objection made to such a question that some of the facts are competent. Nor is it the duty of the defendant, especially in the absence of any request by the court or the opposing counsel, to grope through the great mass of facts, and point out such as are particularly objectionable. Where the evidence as a whole is in its very nature essentially objectionable, a general objection is sufficient.

2. *Same. When immaterial.*—Evidence that the prosecutor appointed by the defendant, on the trial instituted in the ecclesiastical court, who from his being a communicant of the church must be assumed to be canonically qualified to act in such capacity, was, while in state of gross intoxication kept over night by defendant, and remained in his company the next day, and was thereafter continued by him as prosecutor in said proceeding, is wholly im-

material, and its sole effect is to disparage and defame the defendant and prejudice him in the minds of the jury.

3. *Same. Incompetent.*—Where nothing had been said about a certain loan in either of the pamphlets issued by the parties, and there was no allegation about it in the pleadings, but a witness whose deposition had been taken *de bene esse*, spoke incidently, as a reason for his remembrance of another fact, that he was so much shocked about " this loan of $500," testimony that said amount had been previously paid, is incompetent, not within the issue, probably harmful to defendant and should not have been received.

4. *Same. Impeachment of person not a witness.*—The allowance of evidence as to the bad reputation, for truth and veracity, of a person in the community where she resided, upon whose statements defendant had based certain charges against plaintiff, was erroneous, on the ground that defendant should not have been deprived of the benefit of the information thus received upon which he in part relied and acted, by such a general impeachment of the character of the person, not a witness, from whom the information emanated.

5. *Same. Opinion.*—Where the sole issue was whether the defendant had knowledge of the rumors affecting plaintiff's character for purity, and had received such information that he could, in good faith, and without actual malice, print the pamphlet in which it was charged that the plaintiff's reputation was infamous in the Indian Country, and that he was impure and unchaste with Indian women, the opinion of a witness that plaintiff was innocent of previous immoralities which the witness had long before investigated, was not competent, and was well calculated to prejudice the case of the defendant.

6. *Same. Explanation.*—The defendant, in an action for libel, is entitled to show the circumstances which provoked a disparaging remark made by him concerning plaintiff, and under which it was made, and that the remark was not made maliciously, but while burning with indignation, and shocked by what he had just heard in reference to the conduct of plaintiff.

7. *Same. Refute malice.*—Where defendant, in his pamphlet upon certain portions of which the action for libel was founded, has made statements affecting plaintiff's conduct in pecuniary matters, and plaintiff has been allowed to testify that they are false, it is competent for defendant, upon the issue of good faith and malice, to show upon what evidence his statements were based.

Appeal from a judgment of the general term of the

supreme court, affirming a judgment entered upon a verdict in favor of plaintiff in an action for libel.

*Steven P. Nash* and *Samuel Hand*, for appellants.

*William Henry Arnoux* and *Haley Fiske*, for respondents.

EARL, J.—This is an action of libel, in which the plaintiff, a clergyman, recovered against the defendant, his bishop, a verdict of $10,000. From 1873 to the commencement of this action the defendant was missionary bishop of the Protestant Episcopal Church for Niobrara, a jurisdiction over a district of country chiefly settled by Indians, located in the state of Nebraska and the territory of Dakota, and the plaintiff, during a portion of the same time, was a missionary presbyter in the same jurisdiction, and as such was under the charge of the bishop, and subject to removal by him. On the twenty-fifth day of March 1878, the defendant addressed to the plaintiff a letter signed by him as bishop, of which the following is a copy :

"MY DEAR BROTHER: I address you by this title, and acknowledge the obligation, which its use involves, even while I perform the painful duty of writing to say that your persistent disregard of your pecuniary obligations, and your evil report in this neighborhood, render your continuance in the Niobrara mission hurtful to it. I have therefore not appointed you a missionary for this year, and have so notified the Indian committee, and your connection with the mission will end this day. Your stipend for this month has been deposited with Messrs. Weare & Allison. I am authorized by the committee to continue your salary for a short time, if equity should demand such a course. With the severance of your connection with the mission ceases, of course, your right to the use of any of the buildings, the title of which vests in the Indian committee. I take this action only from a sense of duty, and with the most painful reluctance."

On the eleventh day of April thereafter the plaintiff demanded of the defendant letters dimissory to the diocese of Nebraska, and, in case of refusal of such letters, an immediate trial before an ecclesiastical tribunal organized under

the canons of the church.   The defendant immediately organized a court, and that was, after entering upon the trial, dissolved, and then another was constituted, which also entered upon the trial, and finally adjourned *sine die*, without reaching any conclusion.   These courts were attended with some difficulties, embarrassments, and objections, which rendered them abortive.

The failure of these trials was charged by the plaintiff to the conduct of the defendant, and by the defendant to the conduct of the plaintiff.   After their failure on the seventeenth day of February, 1879, the plaintiff composed and addressed a letter to the general secretary of the board of managers of the Domestic & Foreign Missionary Society, which was afterward printed in pamphlet form, and a copy thereof was sent to all the members of the missionary society, which included all the bishops of the Episcopal Church and others.   That pamphlet covers about 30 pages of the printed record, and in it the plaintiff set forth in great detail his relations with the defendant, and made a most vehement, eloquent, and forcible statement of the wrongs which he claimed to have suffered from the defendant.   He accused the defendant of taking every occasion to insult and humble him, and to abuse and browbeat every Indian who dared to lift up his voice in his favor, of treating with kindness every one who was found willing to turn against him, and of openly rejoicing at any information or suspicion that he could turn to his discredit.   He characterized his conduct as unlawful, insincere, unfair, unjust, uncanonical, cowardly, unmanly, dishonest, outrageous, remarkable, shameful, passionate, subtle, unscriptural, indefensible, monstrous, unrighteous, highhanded, atrocious, heartless, and cruel.

On the twenty-second day of July, 1879, the defendant composed and caused to be printed, also in the form of a pamphlet, a reply to the plaintiff's pamphlet, which contained the matter charged in the complaint to be libelous.   It was marked " Private," and sent to the bishops and other mem-

bers of the missionary society, and to a few other persons especially interested in the missionary work among the Indians.    In it he charged the plaintiff with misconduct in reference to his pecuniary obligations and other financial matters, and with various acts of gross impurity and adultery. Subsequently, in February, 1880, finding the defendant in the city of New York, the plaintiff began this action by service of process there.    In his complaint he does not complain of any of the charges made against him in reference to his financial transactions and pecuniary obligations, but bases his action solely upon the charges of impurity and adultery.    In his answer the defendant admits that he composed the pamphlet containing the alleged libel, and alleges that his action in reference to the matters stated was official and based upon the evil reputation of the plaintiff; that it was written in reply to the previous pamphlet composed and circulated by the plaintiff, and to protect his personal and official character from the attacks of the plaintiff, and not otherwise; that his action in the matter was made, necessary by his sense of duty to the church of which he was a bishop, and to the missionary board under whose authority he was acting, and was without malice, and, therefore, privileged; that he would prove, in mitigation of damages, the existence of the rumors and reports stated in the extracts from the pamphlet which were set out in the complaint and that there was reasonable and probable ground for his believing the information, rumors and reports therein referred to, and for expressing the conviction of the truth of them therein expressed.

Upon the trial the judge held that the pamphlet complained of was so far privileged, that the plaintiff, to maintain his action, was bound to show that the defendant was guilty of bad faith, and actual malice in the publication thereof, and whether he was or not, was the only substantial issue of fact to be tried.

The trial took place more than a thousand miles distant

from the country where all the matters to be investigated occurred, and where the evidence relating to them was to be found, in a community where the value of the Indian, and other evidence, and the significance of the facts could not be as well appreciated as they could have been by a jury of the vicinage. The nature of the case was such that the prejudices, passions and sympathies of the jurors could easily be aroused and their judgment warped, and hence the rules of evidence should have been strictly observed and enforced; and it is quite difficult, if not impossible, to say what influence prejudicial to the defendant, any illegal, incompetent or immaterial evidence may have had. A careful study of the whole case led us to the conclusion that the defendant was or may have been prejudiced by the reception against his objection, of evidence which we believe to have been incompetent, and by the exclusion of evidence offered by him which should have been received.

1. Upon the trial the defendant put in evidence the plaintiff's pamphlet of February 17, 1879, for the purpose of showing the provocation and occasion of the publication made by him, alleged to be libelous, and the trial judge held that it was competent for that purpose, but not as evidence of the facts therein stated. Subsequently while the plaintiff was giving evidence as a witness on his own behalf, being shown the pamphlet, he was asked: "Are the facts stated in that paper— those that are stated upon your personal knowledge—true?" The defendant's objection to this question was overruled, and he answered, "they are." In this ruling we think there was error. As no ground of objection was specified, the defendant is not now in a position to claim that the plaintiff was permitted to verify in bulk the multitudinous facts contained in the pamphlet. Nearly all the facts alleged therein were stated positively, and it must have been utterly impossible for the jury to discriminate between facts stated upon personal knowledge, and those which were stated as mere matters of opinion and belief, and upon this ground

too, the question was objectionable, but probably this ground also ought to have been specified. But the pamphlet contained some allegations of fact which were incompetent, some which were wholly immaterial and irrelevant to the issue, and some which, from their nature, the plaintiff would have been incompetent to prove, if he had been particularly questioned in reference thereto. A few specimens will be given: " The facts are that the Indians who are my friends were all attending church regularly, and the idea of throwing away their religion had never entered their heads, but because they were indignant and sorrowful at the course pursued by their bishop, they would only for special reasons go to the Central Church at the agency when the new missionary was installed." Speaking of a letter addressed to the Christians of the Santee people by Bishop Clarkson, alleged to have been written at the request of the defendant, the pamphlet states: " So this letter had no effect upon the Indians, except to make them wonder how so good a man could have been led to do blindly so unjust an act. This bishop has since told me he was sorry for it, and that he wrote the letter with great reluctance and hesitation, and acknowledged that it was an unfair interference with a presbyter who had asked for a hearing, and only asks what it appears is by no means to be granted to him." Speaking of the person who was appointed prosecutor upon one of the attempted trials of the plaintiff, it characterizes him thus: " He is a discharged soldier of bad record, an adventurer who has for a long time led a dissolute life and is habitually profane, and he has in no manner mended his ways since being employed by the bishop, who still retains him though his frequent dissipations have been reported, and who admits him at all times to the mission house which I am already adjudged unworthy to enter." Speaking of one of the attempted trials it states. " The case was by him withdrawn in a cowardly and unmanly way, for the only reason that it had become evident from the worthlessness of his testimony

that the defendant must be acquitted." It is also stated as follows : " He said to the Indian catechist that it would be very bad for him if I was acquitted." He (the defendant) said he had only resorted to this subterfuge to gain a few months' time until the fall of the year, that the whole country might be ransacked if haply they might discover testimony that would convict me. As a member of the court forcibly expressed it, " the bishop let go, to try and get a better hold." It is also stated that, at a convention of the clergy called by the bishop within his jurisdiction, the case between the defendant and the plaintiff was skilfully laid before them in detail, for the purpose of procuring an opinion favorable to his action already taken, and that the convocation was procured to adopt a resolution reciting that, under the circumstances, a presentment against the plaintiff was justifiable ; that, at the same time, a resolution of love and sympathy for the plaintiff was adopted, and that the defendant severed the former resolution from the latter, and caused it to be printed and sent to the secretary of the Indian commission for general distribution, and then it is stated, " When this became known, the clergy were indignant, and three of them, to my knowledge, protested against it as an outrage ; " and then the· pamphlet contains abstracts from the letters severally written by the three clergymen. And then it is further stated : " I have given only a small part of the abundant testimony at hand as evidence of the irregularity, passion, and subtlety which has characterized all these extraordinary and indefensible proceedings."

We have now gone far enough to show that there was much matter in plaintiff's pamphlet which was wholly incompetent and irrelevant upon the trial of this action. So far as the facts contained in the pamphlet of which the plaintiff had personal knowledge, and in reference to which he was competent to testify, bore upon the issue of malice and bad faith, they were competent evidence ; and, if the inquiry had been exclusively confined to them, the defendant

would have had no reason now to complain. But the question and the answer covered both facts that were competent and material, and those that were incompetent and immaterial, and hence both were improper. A question must be wholly competent and material, or it must be excluded. When a party assumes to prove in bulk such a large group of facts, he must be sure that they are all competent; and it is no answer to an objection made to such a question that some of the facts were competent. It was not the duty of the defendant, particularly in the absence of any request by the court or the opposing counsel, to grope through the great mass of facts, and point out such as were particularly objectionable. As the evidence as a whole was in its very nature essentially objectionable, a general objection was sufficient.

2. At the first meeting of the ecclesiastical court, organized for the trial of plaintiff, he had objected to the appearance of the defendant against him as a prosecutor, and his objection was sustained by the court. The defendant then designated one Fox, an attorney residing within his jurisdiction, as prosecutor, and he appeared before the court in that capacity. He was the same person charged in plaintiff's pamphlet as being a disreputable character. He claimed to be a communicant of the church, and in the absence of proof to the contrary it must be assumed that he was, and that he was thus canonically qualified to act as prosecutor.

While the plaintiff upon the trial was giving evidence as a witness on his own behalf, and after he had testified to the appearance of Fox as prosecutor, he was asked by his own counsel this question: "Do you know whether this man Fox was an associate of Bishop Hare at his house?" This was objected to on behalf of the defendant, and the objection was overruled, and the plaintiff answered: "He was; I know upon one occasion of his going there in a state of gross intoxication, and of Bishop Hare keeping him over night and then being in his company the next day. After that

the bishop continued him as the prosecutor in the proceeding that he instituted against me." This evidence was wholly immaterial, and its sole effect was to disparage and defame the defendant and prejudice him in the minds of the jury.

3. Upon the trial the plaintiff read from a deposition of Bishop Whipple taken *de bene esse,* and the defendant's counsel read from the same deposition by way of cross-examination, evidence in which he spoke of meeting the defendant in Boston, and he gave as a reason for remembering that the defendant began the conversation there had about the plaintiff, that he was so much shocked about "this loan of $500." He did not state what loan was referred to nor what the defendant said upon the subject. He was not inquired of nor examined as to the loan, but what he said about it came out incidentally as a reason for his impression or remembrance of another fact. Nothing had been said about this loan in either of the pamphlets, and there was no allegation about it in the pleadings. Subsequently, while the plaintiff was being examined as a witness on his own behalf, his counsel asked him this question: "He stated something to Bishop Whipple about a $500 note, which shocked the bishop very much. Will you state whether that note at the time of this conversation with him was paid?" This was objected to on behalf of the defendant as not being contained in the pamphlet, but as being drawn out by the examination of Bishop Whipple. The objection was overruled and the witness answered: "I paid that note and Bishop Hare had the money in his possession at the time with 10 per cent interest on it."

This evidence was incompetent, not within the issue, and probably harmful to the defendant and should not have been received.

4. In the year 1877, a female teacher in one of the schools under the defendant's charge stated to him that an Indian girl, Cecelia Benoist, a pupil teacher in the school, had made known to her the fact that the plaintiff had brought to her

a pair of pantaloons to be mended, and as she was looking at them said to her : "Cecie, I love you very much; won't you walk with me to-night? I want to talk with you," and that Cecelia's modesty was very much offended by his manner; and upon this information the defendant in part relied in making the charge in his pamphlet that the plaintiff had tampered with school girls. Upon the trial plaintiff's counsel asked one of the witnesses, a clergyman, who resided within the defendant's jurisdiction, and who had testified that he knew Cecelia Benoist there, this question : "Do you know what was her reputation for truth and veracity in that community?" The defendant's objection to the question was overruled, and the witness answered that it was "not good; that it was bad." It does not appear that the defendant knew that her reputation was bad, and it cannot be assumed that he knew it. She appears to have been a subordinate teacher in the school and her story is so far relied upon by the principal of the school that she related it to the defendant. He should not have been deprived of the benefit of the information thus received upon which he in part relied and acted by such a general impeachment of the character of the person, not a witness, from whom the information emanated.

5. Upon the trial of this action the defendant's counsel read from the deposition of Bishop Whipple, in which he testified that the plaintiff came under his jurisdiction as a missionary among the Indians prior to 1865, and that in that year he had rumors prejudicial to his character for chastity ; that he appointed a commission to investigate the rumors, and that the commission made the investigation, and made a report exculpating the plaintiff. He was not asked on behalf of the defendant for his opinion as to the guilt or innocence of the plaintiff, and expressed no opinion on that subject, and he testified to no facts showing or tending to show that he had any ill will toward the plaintiff, or that he had any belief in or connection with the alleged libelous charges made by the defendant against the plaintiff. The

plaintiff read from the cross-examination of the bishop, in which he was asked this question : "From the examination that you yourself made of the evidence in regard to those charges, in 1865, did you form any conclusion in your own mind as to the innocence or guilt of Mr. Hinman ? " The objection on behalf of the defendant was overruled, and the witness answered, " That he was innocent absolutely." There was nothing in the previous examination of the bishop on behalf of the defendant that made his evidence competent. The defendant had no part in the examination of the plaintiff's conduct, instituted in 1865, and was in no way concluded thereby. Rumors affecting the plaintiff's character for purity again became rife in the Indian country within the defendant's jurisdiction, in the fall of 1873, and the defendant conceiving it to be his duty to investigate them, associated with himself the bishops of Minnesota and Nebraska, and such an investigation as could be made resulted in the plaintiff's exculpation. Some years thereafter similar rumors again became rife in the Indian country, which led up to the charged made by the defendant upon which this action is based. The continuance of these rumors affecting the plaintiff's character during so many years, may have led the defendant in good faith to doubt the accuracy of the conclusions reached in the former investigations, and in 1879, when he wrote his pamphlet, he had the right, in weighing the facts and the information which came to him, to take into account the plaintiff's whole life among the Indians, and his standing and reputation in the Indian country. From all the information he had in 1879 he was not bound to believe that the rumors affecting the plaintiff's character in 1865, and in 1873, were unfounded. It was, therefore, prejudicial to him to throw into the scale against him the absolute opinion of a most distinguished prelate that the plaintiff was innocent in 1865. It not was one of the issues that was to be tried whether the plaintiff was actually guilty or innocent at any of the times mentioned. But the sole issue was whether the

defendant had knowledge of such fact, and had received such information that he conld, in good faith, and without actual malice, print the pamphlet in which it was charged that the plaintiff's reputation was infamous in the Indian country, and that he was impure and unchaste with Indian women, and upon that issue the opinion of Bishop Whipple was not competent, and was well calculated to prejudice the case of the defendant.

6. We are also of opinion that some evidence, to which the defendant was entitled upon the trial, was improperly excluded. In the plaintiff's pamphlet he stated that when Miss West, a female friend of his, elected to leave the mission and take up her lot with him, the defendant told her he was "sorry she had any connection with such a beast." The defendant, while giving his evidence on his own behalf, was asked this question : "Now I want to ask you whether anything, and if so what had occurred immediately prior to meeting Miss West, which led you to use the expression which before recess you said you used, in plaintiff's pamphlet, ' sorry that she had any connection with such a beast,' or, as you stated, ' sorry that she had cast in her lot with such a beast?'" and he answered : "I had just heard of a shocking act of Mr. Hinman in connection with one of the girls of my school." Upon motion of plaintiff's counsel this answer was stricken out. We think the defendant was entitled to the answer. It appeared that the defendant had made this disparaging remark of the plaintiff, and he was entitled to show the circumstances which provoked it and under which it was made, and that the remark was not made maliciously, but while burning with indignation, and shocked by what he had just heard in reference to the conduct of the plaintiff.

The defendant's pamphlet contained charges against the plaintiff affecting his conduct in pecuniary matters, although in the plaintiff's complaint no mention was made of that portion of the pamphlet, yet upon the trial, upon the question

of defendant's malice, the plaintiff was permitted, against the objection of the defendant, to give explanatory or exculpatory evidence in reference to those matters, denying them. But when the defendant was giving evidence on his own behalf, the judge refused, upon the offer of his counsel, to allow him to state what evidence he had before him for making those statements, and in this there was error. It appearing that the defendant had made these statements, and the plaintiff having testified that they were false, it was competent, upon the issue of good faith and malice, to show upon what evidence his statements were based.

There were upon the trial other rulings of the judge in the admission and rejection of evidence which were dangerously near to error, if not actually erroneous; but the errors we have particularly pointed out constrain us to believe that the ends of justice require that this judgment should be reversed.

The difficulties and embarrassments attending the trial of this action in the city of New York are such, and consequences of any conclusion so serious to one or the other party, that we may, with propriety, venture to say that the welfare of the missions among the Indians, and that the cause of religion, to which both parties are especially dedicated, would be best promoted if this case, in the spirit of forbearance and charity divinely taught, could be taken out of court, and left to the wise and judicious arbitrament of mutual friends.

The judgment should be reversed, and a new trial granted.

RUGER, C. J., concurs; RAPALLO and ANDREWS, JJ., concur in result.

DANFORTH, J., (Dissenting.)—The complaint alleged that the plaintiff was a clergyman, and for 20 years then last past had been a presbyter of the Protestant Episcopal Church in America, of the rank of priest in good standing; that

for 17 years before March, 1878, he had been a missionary of the church to the Santee tribe of Dakota Indians, in Nebraska and Dakota, and at the times embraced in the complaint, was under the ecclesiastical jurisdiction of the defendant, then missionary bishop of Niobrara ; that the defendant on the twenty-second of July, 1879, " maliciously composed and published a printed pamphlet, signed by himself, which he entitled, " The Rehearsal of Facts," and caused to be circulated among the bishops and clergy of said church and elsewhere, and which was therein expressed to be done on his own responsibility, and which contained the false and defamatory matter following concerning plaintiff, who is therein mentioned as Mr. Hinman, to-wit :

"In regard to the second cause of Mr. Hinman's removal, I make the following narrative of events : Reports having continually been brought to my attention, which reflected painfully upon his purity of character, in the summer of 1877, I called to me the Rev. Dan. Hemans, a discreet native presbyter under Mr. Hinman's care, and repeating to him some of the charges of impurity made against Mr. Hinman, I asked him what he thought of them. He was reluctant to express himself, but at last replied : "I have never seen anything ; but the Christian people among the Santees believe the reports to be true, and we wish we had another minister." This opinion of Mr. Hinman was and is shared by the other Santee presbyter, Rev. L. C. Walker, and by the Santee deacon, Rev. Amos Ross.

" At the general convention of 1877 Bishop Whipple remarked to me that stories were again afloat reflecting upon Mr. Hinman's character for purity, and that Mr. Hinman must be, to say the least, a very imprudent man. A few weeks later, in Philadelphia, Mr. William Welsh came to me and reported that a gentleman had said to him that it had come to him very directly that Mr. Hinman was regarded in the Indian country as a man of abandoned character, and that it was believed that his wife died of syphilitic disease contracted from her husband. On my return to Niobrara an Indian inspector told me that Mr. Hinman's adulteries were the common talk wherever he went. On my repeating this to the Rev. J. G. Gasman, a presbyter of Niobrara, he replied that there was no doubt that this was the case. Some weeks later the house-mother of one of my boarding-schools reported to me that Mr. Hinman, while visiting her school, had scandalized her older girls by beckoning to them in a suspicious way from his window in the twilight, and that he had abashed a pretty half-breed young

woman, her assistant, by saying to her, '——, I love you. Won't you walk with me to-night; I want to talk with you.'

" On my return to Yankton agency, some weeks later, the Santee candidates for the ministry, three in number, united in a letter, in which they requested that I would appoint some one, other than Mr. Hinman, their, Bible teacher. Later, they informed me that shameless acts were laid at Mr. Hinman's door; that they were generally believed to have been perpetrated; and that the Santee church people were ashamed and discouraged. They sent to me, at my request, a young man, a communicant of the church, whom they represented as a quiet and worthy man, who told me that he had discovered Mr Hinman lying with an Indian woman. A little later, in December, 1877, a lady, a communicant long known to me, and for years occupying a place of trust under the same roof with him, sought me in great distress of mind, and confessed to me that Mr. Hinman, under promise of marriage, had seduced her. At my request she put this in writing and swore to it.

" In January or February, 1878, the commissioner of Indian affairs in his office told me that there was a clergyman connected with my mission who was a man of most immoral character, who was bringing great disgrace upon it. In reply to my inquiries, he said that it was Mr. Hinman; that he was a known adulterer; that he had been seen in a brothel in Washington; and that he ought to be gotten out of the Indian country, as a man whose presence was detrimental to the welfare of the Indians.

" I state, in addition to the above, that one lady helper reported to me that parents, when she asked them to send their girls to the Santee boarding-school, refused, on the ground that girls sent there were tampered with by the missionary; that another lady, who has been in the mission for seven years, put in my hand a written statement, in which she declared, among other things, that, on going suddenly upstairs in Mr. Hinman's house, she saw him emerge from the servant's room, where he had been with the door shut; that he slunk away covered with embarrassment, and that, on going into the servant's room, she found her flushed and in a tremor; that I have the statement of another lady, who has been eight years in the mission, that Mr. Hinman, on one occasion, to her great alarm, seized her firmly around the waist, and, though she struggled to get free, kissed her several times, and refused to let her go; that the wife of one of the native ministers states that, when she was a pupil in St. Mary's School, Mr. Hinman stroked her cheek, and kissed her, and that she told him she would tell Sister Mary, (her teacher); and a written statement of a white clergyman of the mission, reluctantly given because of his

friendship for Mr. Hinman, that Mr. Hinman was intoxicated in his presence. * * *

"Notwithstanding my personal conviction of the truth of the charges of impurity made against Mr. Hinman, my official action has been grounded entirely on his reputation. Of that there is no doubt. His name is a byword, his reputation infamous * * *

"I could not tolerate his presence under the same roof with my girls' school."

The answer contains no general denial, nor any denial of the state or condition of the parties, nor the professional engagements of the plaintiff, admits that the defendant composed the substance of the pamphlet, part of which he says is set out in the complaint, and signed the same; that before doing so and on the 25th of March, 1878, he terminated the connection of the plaintiff with the Niobrara Mission, and communicated his action by a letter addressed and delivered to the plaintiff, containing these words:

"Santee, March 25, 1878.

My Dear Brother: I address you by this title, and acknowledge the obligation which its use involves, even while I perform the painful duty of writing to say that your persistent disregard of your pecuniary obligations, and your evil report in this neighborhood, render your continuance in the Niobrara Mission hurtful to it. I have, therefore, not appointed you a missionary for this year, and have so notified the Indian committee; and your connection with the mission will end this day;" that thereupon the plaintiff demanded letters dimissory, or a trial according to the regulations and canons of the Episcopal Church, for the trial of clergymen; and the defendant refusing the letters, proceedings were taken for a trial, but it fell through; a new court subsequently appointed, failed to convene; and thereupon, on the 11th of March, 1879, the plaintiff appealed to the board of managers of the domestic and foreign missionary society of said church, in a statement detailing his grievances, and making false, defamatory and calumnious charges in respect to this defendant's action.

This statement, preceded by a preface, signed by the plaintiff and dated May 26, 1879, in which he mentioned the refusal of said board of managers to entertain his appeal, and then added: "What further can the complainant do but tell it to the church?" was printed in pamphlet form, and as defendant is informed and believes, widely circulated by the plaintiff; that the paper described as "The Rehearsal of Facts" was in reply to that statement and the same was written without malice, for the information of the board of managers of said missionary society, and for whom alone it was intended, without malice and under circumstances which constituted the same a privileged communication.

The answer, however, admits that the pamphlet was sent by the defendant not only to the managers of the missionary board, but "to several other persons, not more than eight in all; who took an interest in the mission work, which (as the answer states) was imperiled by the conduct of the plaintiff."

The truth of the matter is not averred, nor is justification set up, but as a separate answer the defendant alleges that he will prove in mitigation of damages the existence of the rumors and reports stated in the extracts from defendant's pamphlet, which are set out in the complaint, as they are therein stated, and there was reasonable and probable ground for the defendant's believing the information, rumors and reports therein referred to, and expressing the conviction of the truth of them therein expressed. Upon trial before a jury the plaintiff had a verdict. A motion for a new trial was denied, and after judgment it was affirmed by the general term. The defendant now appeals to this court.

Whether the writing described in the complaint was "maliciously composed and published," was by the pleadings made a material question, and the burden of establishing it was upon the plaintiff.

To write of another that he was " of abandoned character; " that " his wife died of syphilitic disease contracted from her husband; " that " his adulteries were of common talk in certain localities;" and being a clergyman and missionary among the Indians, to write also that " he ought to be gotten out of the Indian country, as a man whose presence is detrimental to their welfare," was enough, upon the face of the paper and proof of publication, to entitle the aggrieved party to his action.

The law implies malice from such a transaction. Those facts and others not less serious appeared here, and the case was tried upon that theory. When the plaintiff rested, the defendant moved for a nonsuit, upon the sole ground that there was not sufficient evidence of publication to put him upon his defense. Except for that, it was conceded by implication, therefore, that the plaintiff's case was made out. Nor is any doubt now suggested by the appellant that publication was well proven, nor as to the correctness of the decision which denied the motion then made.

The defendant afterward opened his side and gave evidence in support of the answer which alleged that the pamphlet was privileged, and composed and published without malice, and rested.

The plaintiff in reply gave evidence, among others things, of the acts and words of the defendant, relevant to the case thus made, and which tended to show that the charges against the plaintiff were false in fact, and not made by the defendant in good faith, or under circumstances from which he might reasonably believe them to be true, or in the belief at the time that they were true, and rested.

The learned counsel for the defendant again moved to dismiss the complaint upon the ground that no proof of malice has been given in reference to this publication, sufficient to carry it to the jury. The motion was denied, and the defendant excepted.

It may be assumed, although the fact does not appear, that the motion was argued upon the assumption by the defendant that the communication was privileged. If that was so, it was because it was a reply to a previous statement of the plaintiff, or because there was evidence of such relation between the defendant as bishop, and the board of missions, as relieved him of the character of a volunteer, and such relation between the plaintiff and board of missions as gave them an interest in the plaintiff and a knowledge of his true character, and made the information, therefore, such as as they had a right to expect, concerning the conduct and character of one acting as their agent, or at least by their authority and sanction.

Both aspects are presented by the answer. But the defendant would nevertheless be liable if the untrue statements were in excess of what the occasion required, or if there were any want of good faith in making the communication, or in its publication; and those questions were exclusively for the jury. The contention of the defendant is not that there was no evidence of malice, but that it was not sufficient

to carry the question to the jury. When the plaintiff rested the first time, he had abundantly established malice in law. It appeared upon the face of the paper that the charges were injurious, and in the absence of reasonable excuse for making them, malice was to be inferred.

Upon the defendant's evidence in explanation something more, in our view of the case, might be required from the plaintiff. So far as the communication was privileged, the law ceased to infer malice from the mere falsity of the charge, and other proof of its existence was required; for, as is held in Lewis *v.* Chapman, 16 N. Y. 369, the term " privileged " simply means that the circumstances under which an alleged libelous communication was made, were such as to repel the legal inference of malice and throw upon the plaintiff the burden of proving it by extrinsic evidence. The issue to be determined remained the same, its character was not changed. The question is the same: Was the paper maliciously composed and published?

We have more than once held that it is for the court to determine whether the subject matter to which the alleged libel relates, the interest of the author in it, or his relations to it, are such as to furnish an excuse, but that the question of good faith, or belief in the truth of the statement, and the existence of actual malice, remains for the jury; Klinck *v.* Colby, 46 N. Y. 427 ; Hamilton *v.* Eno, 81 N. Y. 116 ; and is to be determined by them, either from direct proof, or as an inference from other proof, or even from the libel itself. If the communication contains expressions which exceed the limits of privilege, such expressions are evidence of malice. Hamilton *v.* Eno, *supra.* So, the matter set forth in the libel, though under other circumstances justifiable, may embrace statements so unnecessary for the occasion to which it is applied, as to form strong evidence of malice upon the issue of whether the communication is covered by the privilege, and whether the writer has fairly and properly conducted himself in the exercise of it, and an inference of

actual malice may be drawn from its use. So, there was evidence on which it might be said that some of the statements were false, to the defendant's own knowledge, and of others that they were not believed by him ; and it is only where there is no intrinsic or extrinsic evidence of malice that the court can direct a nonsuit. From each of those surces, even at this stage of the case, enough had appeared to require the intervention of a jury. But both sides, after the denial of the motion, gave much additional evidence directed to this very question, and it is therefore unnecessary to say more as to how the matter stood when the motion to dismiss was in fact made. At the close of the case it was not renewed. It is enough that there were questions arising upon the evidence which could be answered only by a jury.

The appellant contends, however, that the plaintiff's evidence to show malice was allowed to take too wide a range. The question is, what was material under all the circumstances of the case ? For, if any fact failed to support the issues it was irrelevant, whether it was near or remote in point of time. No different ruling was made by the trial judge. The objections upon which the point is placed were two : (1) To the relevancy of any evidence anterior to the publication of the pamphlet alleged to be libelous ; and (2) to anything back of 1878. The objections were both made while evidence was going on as to transactions between the parties. No other ground was stated than is above mentioned ; and there is no suggestion that the events then under examination had not at least an apparent connection with the one in issue, or that they might not tend to show the knowledge, spirit, and intention of the defendant in publishing the libel charged. If they did, no time would be too remote, and the plaintiff could not be deprived of them by any arbitrary limitation ; and whether they did or not was no part of the inquiry called for by the objection.

There were other exceptions. While the plaintiff had

the case, in reply to the defendant, the plaintiff's counsel offered to read in evidence, from the canons of the church, title 2, canons 1 and 2, on pages 94, 95, and 96 of the Appendix of the Journal of the General Convention of the year 1877, whereupon defendant's counsel objected to the admissibility of the testimony. The objection overruled, and defendant's counsel excepted. The defendant's counsel had already offered and read in evidence, from the same book as produced in the same journal, articles 5 and 6 of canon 9; and as it cannot be said that, under no circumstances, could such other regulations be competent, in the absence of some specific objection, no error is apparent in allowing the plaintiff to read such additional portions as he might desire.

The defendant's counsel had offered and had read in evidence a paper, called a "Statement of Samuel D. Hinman;" and, that person being on the stand, it was shown to him, and he was asked by plaintiff's counsel, "Are the facts stated in that paper—those that are stated upon your personal knowledge—true?" Then follow these words: "Objected to; objection overruled; defendant excepts." Such an objection raises no question. The paper was already in evidence by the act of the defendant. Was the objection aimed at the form of the question? It might have been modified. The competency of the witness was not questioned, nor the materiality of the facts stated. Whether general evidence should be given of them, or each fact taken separately, would, in any event, be in the discretion of the judge; and, where no specific objection is made to the course proposed, it cannot be first started on appeal.

So, of the next exception. It appeared that the defendant on one occasion proposed to conduct the prosecution of the plaintiff before an ecclesiastical court, and, upon objection made, the court refused to allow him to do so, and at the adjourned day one Fox, an attorney, appeared in his place. The plaintiff's counsel then asked this question:

"Do you know whether this man Fox was an associate of Bishop Hare at his house?" Objected to by defendant, and, it being admitted, he excepted. The importance of the question is not obvious, nor is its incompetency. In the face of only a general objection, there was no error in permitting it.

But even now, in view of the discussion by the learned counsel for the appellant, we do not see that any objection, however specific, could properly have led to the exclusion of any of the evidence to which reference has so far been made.

Two other exceptions to evidence are presented, arising upon specific objections taken to questions addressed to the plaintiff while testifying in reply to the case made by the defense. The defendant had put in evidence the entire pamphlet prepared by him, containing, among other things, his letter of dismissal addressed to the plaintiff, dated Santee, March 25, 1876, in which he states, as the ground and reason of that action, the plaintiff's persistent disregard of pecuniary obligations, and his evil report in that neighborhood, and, in the rehearsal, referring to that event, says: "The removal of the Rev. Mr. Hinman from the Niobrara mission was the culmination of grave dissatisfaction with his conduct on the part of the Indian committee and myself, which had existed several years." Two specific reasons, however, were given for the act; (1) His persistent disregard of his pecuniary obligations; and (2) the evil reports which covered his name—and, as if by way of specification, says: "In the year 1872, Mr. Hinman was found to be in debt to an amount over $14,000." The plaintiff, being upon the stand in reply, was asked the question: "That letter alludes to your financial difficulties, and in this paper that he calls his 'Rehearsal of Facts,' he states that you were found to be in debt to an amount over $14,000. State to the jury whether you owed, or at least, what that $14,000 refers to,'—to which the defendant objected, on the ground that the rehearsal was put in evidence

simply for the purpose of showing that the publication of the pamphlet was privileged, and that the matters inquired of are not those alleged in the complaint to have been libelous, and therefore they must be assumed in this action to have been considered at the time the suit was brought by the plaintiff as true. Objection overruled; defendant excepts. The objection is not tenable. A failure to sue for libel is not a conclusive admission of the truth of the matter charged, and the selection of one or more of several imputations as the ground of action does not estop a party from denying the others. And when, as in this case, the defense is that of privilege, the falsity of any of the statements made may be shown; and, if it also appears that they were known to be false, the character of the statement, and the knowledge of the author become material upon the question of actual malice. The question was proper without reference to the information obtained from the answer of the witness. But by that it appeared that the $14,000 was an indebtedness to the whole mission along the Upper Missouri river, accumulated for two years while it was under the plaintiff's charge, and the whole matter had been investigated and settled satisfactorily to all parties concerned, and without any reflection on him before Bishop Hare took office. It was for building churches and mission-houses, and all sorts of expenses of the mission, and was under the plaintiff's charge before Bishop Hare became bishop, and it was settled and paid, and he knew it.

BY THE COURT: "Do you mean to say it was all settled and paid up before March 25, 1878?"

A. "Yes, sir; long before that; before he became bishop."

Now it appears that the defendant became bishop in 1873. Surely, upon the questions I have suggested, the explanation called for by the question was pertinent.

So with the next exception. The defendant in his pamphlet had referred to Bishop Whipple as his authority, for the general statement affecting the character of the plaintiff say-

ing : " At the general convention of 1877, Bishop Whipple remarked to me that stories were again afloat reflecting upon Mr. Hinman's character for purity, and that Mr. Hinman must be, to say the least, a very imprudent man."

The defendant examined the bishop as a witness *de bene esse*, and the plaintiff when replying to the case of privilege read from that examination ; the bishop says that in the fall of 1877, he was present at the general convention in Boston ; that the first he heard of rumors in the Indian country, affecting Mr. Hinman, was from the defendant, in the house in Boston where," he says, " we met." Bishop Hare " said to me, ' Those sad rumors against Mr. Hinman have come up again, and I have evidence that would go to show his guilt ; ' my reply was ; ' if that is the case, you have no option in the matter, except at once to proceed and bring him to trial ; ' at that time I think there was no more conversation ; he mentioned to me on a subsequent occasion the character of some of the evidence he had ; this second conversation was within a few days * * * I am very positive that I did not first mention the subject at that time to Bishop Hare.

And the defendant also read from the same deposition : " It is my impression that when I was in Boston and Bishop Hare spoke to me on the subject before referred to that the first communication was by Bishop Hare to me, because I was so much shocked at what Bishop Hare told me about this loan of $500 ; it showed very great kindness on the part of Bishop Hare toward Mr. Hinman, and that Mr. Hinman had not paid that money or taken any steps towards it ; it rather horrified me ; then when he mentioned the other matter, I was very much startled, as coming from him ; if it had come from anybody else, it would not have produced as much impression on my mind."

While the plaintiff was on the stand his attention was called to this testimony, and he was asked to state whether at the

"time of the conversation between the defendant and Bishop Whipple, the note was paid."

The defendant's counsel objected to the question, because the statement was not in the pamphlet, but drawn out from the examination of Bishop Whipple. It was properly allowed. If at that time the note was in fact paid, the statement by defendant, implying at least the contrary, would have a bearing upon the *bona fides* of the pamphlet and the honesty of the rehearsal. There certainly might be a persistent disregard on the part of the plaintiff of his pecuniary obligations; but if to the knowledge of the defendant the ones specified by him were paid, one as far back as 1872, and the other in 1877, the circumstance was to be considered in the determining whether in the statements made, the defendant did not exceed his privilege. Besides, the existence of the note was made part of the defendant's case, the statement concerning it to Bishop Whipple was by the defendant, and it was clearly competent to prove that statement was untrue.

It is also said in behalf of the appellant that questions put by the plaintiff's counsel to Bishop Whipple were so obviously wrong and so material in their effect as to require a new trial to correct the error. It did not seem so to the trial judge, or the general term, and the reasons given by the latter for refusing to sustain the exception are not answered by the appellant. The testimony of the witness, Whipple, had been taken *de bene esse* in behalf of the defendant, and at the trial his counsel read from the deposition, that in 1860, and 1865, the plaintiff was under the jurisdiction of Bishop Whipple; that in 1865 rumors prejudicial to the plaintiff's character were brought to his attention, and that, as bishop, he took action in reference to those stories," by appointing a commission to examine every one of the rumors, and take proof in regard thereto; that testimony was taken, submitted to a standing committee, and the defendant drew from the witness the result reached by the committee, viz.: that there was nothing which affected injuriously the character of Mr.

Hinman, and the impression of the witness that "they said there was not evidence of indiscretion," although of that he was not positive, that the witness examined the evidence and reported the conclusion reached, and the testimony on which it stood to some 40 persons. No writing was in evidence, and, although the examination instituted by the board was of a judicial character, no writing was produced by the defendant containing the conclusion reached, nor did it appear that the bishop's conclusion was put in that form. It will be seen, therefore, that the defendant had put in evidence a narrative of the proceedings, with the apparent purpose of prejudicing the plaintiff by showing rumors of like character to some of those stated as in existence 10 years later.

It also appeared by that examination that the rumors were found by those whose duty it was to follow them to be groundless, and, inferentially at least, that such was the conclusion of the bishop; for it cannot be supposed that the bishop would present to the persons of his charge a statement of his committee in exoneration of Mr. Hinman unless he himself concurred. But this does not appear distinctly upon the defendant's examination; and, on the same *de bene esse* proceeding, the plaintiff asked the witness on cross examination: "From the examination that you made of the evidence in regard to those charges in 1865, did you form any conclusion in your mind as to the innocence or guilt of Mr. Hinman?" This question involved a fact or circumstance directly connected with matters stated on direct examination, and, moreover, it was not objected to at the time of the *de bene esse* examination. It would seem that no just exception could lie to it. The bishop was shown to have been charged with the duty of investigation, and to have prosecuted it. There can be no good reason why he should not be permitted to state whether he reached a determination as to the matter investigated. Nor, indeed, was any suggested by the counsel for the appellant. The witness replied: "I did, most decidedly." Now, was not

the plaintiff entitled to that conclusion? The thing affecting him had been brought out by the defendant. The existence of rumors reaching the ear of the bishop, and of sufficient moment to move him to the exercise of his jurisdictionary power of discipline, he himself to be the arbiter, after an investigation. The defendant had gone into it again. The whole matter, occurring in 1865, long before the matter in issue, was irrelevant and foreign to it. But it had been brought forward by the defendant, and the plaintiff was entitled to give the whole proceeding to and including the conclusion reached by the ecclesiastical officer, the plaintiff's superior, in order to rebut any injurious inferences which might be drawn from the portion of the deposition read by the defendant. The effect of that portion could only be to prejudice the jury; and the plaintiff had a right to remove, if he could, the prejudice, by showing the decision of the examining tribunal. It would permit the defendant to put the plaintiff in a very false position if, after showing not merely the existence of rumors, but also that they were so current and of such violence as to attract the attention of an ecclesiastical tribunal, and so effectually as to cause an investigation to be set on foot, the defendant could strike out the conclusion reached by the person directing the investigation, and whose conviction as to its result was material. The next question, therefore, by the plaintiff, was a material one. He asked: "What was that conclusion?" The defendant "objected," assigning no ground. For the reasons above stated, we think it was admissible. It may be said, also, that the question put could by no possibility harm the defendant; for, as I have shown, the product of the direct examination permitted the inference, if it did not expressly show that the bishop reached the same conclusion afterwards testified to by him in answer to this question. It may have been cumulative and unnecessary; it was not irregular nor harmful. But, in any view, the defendant cannot complain,

for his own examination of the witness naturally led up to that of the plaintiff.

Some other exceptions were taken to the rulings upon evidence. So far as they have been examined by the general term, we agree in their conclusion ; and, in regard to others not particularly discussed, we find no ruling which an orderly and consistent conduct of the trial did not require. A more interesting subject is presented by the exceptions suggesting errors in the refusal of the court to add to its exposition of the law as applicable to the issues before the jury, and concerning which the great volume of testimony had been submitted. The charge was long, but in view of the mass of evidence, and the importance of the questions to be answered, not unnecessarily extended. It exhibits, as does, indeed, the entire record, scrupulous care and attention on the part of the learned judge, so to direct the progress of the cause as to enable the jury, by their verdict, to reflect the very truth of the case ; and with such success on his part was the last duty performed that to the charge itself no exception whatever was taken, and no error of misdirection is alleged by the appellant. His contention is that some additional information and explanation as to the law should have been given; and it appears from the record that at the close of the case the learned counsel for the defendant presented 18 separate propositions for submission to the jury. No ruling, however, in regard to any of them was then made or asked for ; and the judge charged the jury with more or less fullness upon every topic suggested by them. At the close of the charge, as before observed, no exception was taken to any part of it. The case then states : The court refused to charge, except as already charged in respect to defendant's second, fourth, sixth, fourteenth, sixteenth, seventeenth and eighteenth requests, and defendant's counsel duly excepted. It seems then, that the disposition made of the larger number of the propositions was satisfactory to the defendant. It was not suggested that any

one of the propositions was unnoticed or not charged upon, and two only, the second and sixth, are upon this appeal brought to our attention. Within the well settled and frequently applied rule, therefore, the exception is unavailing.

In Ayrault *v.* Pacific Bank, 47 N. Y. 570, the defendant's counsel presented requests to charge upon 16 distinct points. The exception was to the refusal to charge each of the requests submitted except so far as embraced in the charge delivered substantially the same as in the case at bar, the court on appeal say :

" Whether they were all especially and succinctly noticed by the judge in his charge is not important. Doubtless all that were material were responded to, but this can only be ascertained by a careful and critical study of the charge and the requests in connection. This court is not called upon to perform this task."

It was for the counsel to do this upon the trial, and point out what additional instructions if any were necessary, and in what respect the charge was claimed to be erroneous or insufficient, and wherein it did not conform to the request made. The exception should present the very point intended to be raised, in order that the trial judge may correct the error if either directly or by omission one has been committed.

This rule is reasonable and well settled, and from it there should be no departure. In Requa *v.* Rochester, 45 N. Y. 137, we said : " Such an exception is of no avail. It does not point out in what the counsel conceives that the court has erred. It gives no aid for the correction of an error into which a judge has fallen ; " and in Walsh *v.* Kelly, 40 N. Y. 559, under similar circumstances it is said :

" When the judge had completed his charge it was the duty of counsel to call his attention to any portion where he desired more specific instruction."

Here the charge covers upwards of seventy folios. It is conceded to be correct so far as it went, even in respect to

the matters covered by the requests. It is not the duty of an appellate court to compare one with the other, and to ascertain how much further the instructions should have gone, until the trial judge has had the opportunity to complete the work. It has nevertheless been performed, and this decision has been delayed that neither time nor investigation should be lacking to discover if there existed any error of law which might have prejudiced the defendant in the disposition by the jury of the questions of fact. We find none.

Nevertheless, in view of the earnestness and zeal with which the learned counsel for the appellant has pressed the exception to the ruling of the court in regard to the second and sixth requests, something more may be added. The second was in these words: " That if the defendant had probable cause for believing at the time he issued the pamphlet, the statement charged to be libelous, the plaintiff cannot recover."

The charge actually given was more favorable to the defendant.

" I say to you now (adds the court) if any doubt has heretofore obtained with regard to it, that it proceeds directly and logically from what I have already said, that the communication being privileged and excused unless it originated in malice, that malice is not established by showing that the reports brought to the defendant were in fact untrue. The plaintiff has testified here that he did not commit these acts complained of, and that he is guiltless of them. The question is, however, whether these reports were brought to the defendant in such a manner as to lead him to believe that they were true, and whether he did in fact honestly and in good faith believe, when he included these reports in his publication, in July, 1879, that the plaintiff was of the evil reputation ascribed to him in that publication and that his name had become a by-word. The question is not whether in making this publication he did what you would

consider the wisest thing. There is no other standard by which human conduct can be judged, under such circumstances and conditions as existed in this case, than that of entire honesty and good faith. Of this you are to judge upon a consideration of all the evidence. The question of good faith under all the circumstances may be safely committed to your determination,"—not leaving it for the jury to say whether there was in fact probable cause for the statements, but whether the defendant himself acted honestly in good faith in the belief that the statements were true."

The next request was in these words : " That the incidents connected with the communion services of March 23 and 25, 1878, do not tend to prove malice, and should be laid out of view by the jury." Counsel for both parties commented upon them to the jury, and there had been read in evidence the rules and regulations established by the church of which plaintiff and defendant were members, to show not only the general nature of the sacrament and its administration, but the persons entitled to participate in the communion. In its observance both had taken a part either as actor or participant, under circumstances fully disclosed by the testimony.

I am unable to find error in the refusal, or that the trial judge could have taken from the jury so important a matter, in which the defendant's conduct was displayed. What he afterwards published was then known to him. Was his conduct in accord with a belief in its truth? The object was to exhibit his state of mind at the time of that publication. Did he with that knowledge deal with the plaintiff as one whom he believed guilty of acts which in any community would justify his disgrace and render him not only unfit for his position, but an unseemly associate? It was a circumstance the weight and meaning of which could only be determined by a jury, but it was relevant. It bore upon the belief of the defendant as to the acts attributed to the plaintiff.

The conduct or expressions of a defendant in such a case

may show affirmatively that, in making the charges, he was actuated by ill will, and not by belief. The same result is reached by evidence of conduct inconsistent with that belief and if, from the whole conduct of the defendant, the jury might infer that he did not believe the imputations to be true, but still made them, the plaintiff might have a verdict. It should be observed, also, that the request was not confined to the bearing of the circumstance upon the question of malice, but its exclusion for all purposes ; that it " should " (and the defendant) " be laid out of view by the jury." The evidence was competent as relating to the conduct of the defendant, his belief in the facts afterwards alleged, his state of mind, and it might not unreasonably be considered in weighing his own and the plaintiff's testimony. It was, moreover, upon a subject introduced by the defendant, and further examination as to it was in reply. Even if it had no tendency to show malice, the defendant was not entitled to the charge, because the request was coupled with the untenable proposition that the evidence should be wholly disregarded. All that the defendant said of or to the plaintiff, or said or did in his relations with him, may well be deemed relevant to an inquiry as to his real opinion and belief as to the plaintiff. But, without this, it is an abundant answer to the request that the subject was first broached by the defendant, and further examination as to it was in reply. But the court had already referred to the defendant's version and position in regard to the matter. He had stated also the plaintiff's contention. He had discussed the whole question, and to none of his views or directions in regard to it was any exception taken. Referring to the defendant's position, he said :

" If that was the defendant's view of his duty towards the plaintiff and the plaintiff's right as a presbyter under the rules and canons of the church, it is difficult to see upon what ground he could have repelled him, whatever his opinion of the plaintiff's guilt or innocence of the evil reports concerning him might be; for the plaintiff's office as a presbyter was unquestioned."

The charge was most favorable to the defendant. Under it, the publication, although libelous, was held entitled to protection whether the matters alleged are true or false, so far as it was made in the fulfilment of a duty, or called for by an occasion created by the plaintiff. The jury must have found that it originated in malice,—not malice in law, but actual ill will against the plaintiff,—and was not made in a belief of its truth. The experienced trial judge did not disapprove of the verdict. It was satisfactory to the judges of the general term, who had authority to examine all questions, whether arising upon the facts or the law. I find no legal cause to reverse their conclusions, and think the judgment which followed it, and from which the appeal is taken, should be affirmed.

FINCH, J., concurs.